WAKE COUNTY, EX REL. EVELYN CARRINGTON v. DANIEL TOWNES

No. 8010DC1024

(Filed 15 September 1981)

**Bastards § 10; Constitutional Law § 40— civil paternity suit by State—indigent defendant—right to appointed counsel**

    An indigent defendant in a paternity suit instituted by the State has a right to court-appointed counsel pursuant to the due process requirements of the Fourteenth Amendment of the U.S. Constitution and the Law of the Land provision in Art. I, § 19 of the N.C. Constitution.

    Judge MARTIN (Robert M.) dissents.

APPEAL by defendant from *Bullock, Judge.* Order entered 15 July 1980 in District Court, WAKE County. Heard in the Court of Appeals 29 April 1981.

Wake County (County), through its Department of Social Services' Child Support Enforcement Agency, initiated this action on 4 February 1980 in order to obtain a civil adjudication that the defendant, Daniel Townes, is the father of Cory Daniel Carrington and to obtain an order directing defendant to make support payments for the child. The child is the illegitimate son of Evelyn Carrington, and Ms. Carrington is a recipient of Aid to Families with Dependent Children (AFDC) funds. Based on Ms. Carrington's allegations that the defendant is the father of the child, the County, pursuant to statute, filed this action to establish paternity.

Upon being served with the Complaint, the defendant, who is indigent, contacted East Central Community Legal Services (Legal Services) for assistance. Legal Services told defendant that federal regulations (45 CFR 1601) and office policies prohibit Legal Services from representing individuals Legal Services believes have a right to court-appointed counsel. Legal Services, however, did agree to make a limited appearance for the purpose of ensuring that defendant received appointed counsel. At a preliminary hearing on 16 April 1980, defendant filed an affidavit of indigency and a motion seeking appointment of counsel claiming that such an appointment was required by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, Section 19 of the North Carolina Constitution. The trial

---

Carrington v. Townes

---

court concluded in its order that "neither the due process clause of the United States Constitution nor Article I, Section 19 of the North Carolina Constitution guarantees an indigent defendant the right to court-appointed counsel in civil paternity actions. . . ." Defendant appeals from the denial of his motion.

*East Central Community Legal Services, by Gregory C. Malhoit and M. Travis Payne, for defendant appellant.*

*North Carolina Civil Liberties Union, by Stanley Sprague, Amicus Curiae Brief for defendant appellant.*

*Wake County Attorney, by Shelley T. Eason, for plaintiff appellee.*

*Attorney General Edmisten, by Assistant Attorney General Henry H. Burgwyn and Associate Attorney Clifton H. Duke, Amicus Curiae Brief for plaintiff appellee.*

BECTON, Judge.

The sole issue in this appeal is one of first impression in North Carolina: whether an indigent defendant in a paternity suit instituted by the State has a constitutional due process right to court-appointed legal counsel. Based on the Fourteenth Amendment due process requirements of the United States Constitution, *and* on the Law of the Land provision in Article I, Section 19 of the North Carolina Constitution,[1] we hold that an indigent defendant has a right to appointed counsel in paternity suits instituted by the State.

I

Due process must be afforded when a State seeks to deprive an individual of a protected liberty or property interest. *In-*

---

1. Although the Law of the Land provision in the North Carolina Constitution is synonymous with the due process clause of the United States Constitution, United States Supreme Court decisions interpreting the due process clause of the Fourteenth Amendment to the Federal Constitution are instructive, but they do not restrict or control our courts' interpretations of the Law of the Land provision in the State constitution. *Horton v. Gulledge*, 277 N.C. 353, 177 S.E. 2d 885 (1970). Moreover, our interpretation of State constitutional due process requirements may be more expansive than the minimal due process requirements of the United States Constitution. *See Lassiter v. Dept. of Social Services*, --- U.S. --- , 68 L.Ed. 2d 640, 101 S.Ct. 2153 (1 June 1981).

*graham v. Wright,* 430 U.S. 651, 51 L.Ed. 2d 711, 97 S.Ct. 1401 (1977). Once a fundamental interest is placed in jeopardy by State action, a court of review must focus its inquiry on the sufficiency of the procedures involved to ensure fairness to the potentially aggrieved individual. *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 95 L.Ed. 817, 71 S.Ct. 624 (1951). At its minimum, then, due process requires that every individual forced by the State to resolve claims of right, duty and liability through the judicial process be afforded a meaningful opportunity to be heard. *Little v. Streater,* --- U.S. --- , 68 L.Ed. 2d 627, 101 S.Ct. 2202 (1 June 1981); *Boddie v. Connecticut,* 401 U.S. 371, 28 L.Ed. 2d 113, 91 S.Ct. 780 (1971); *State v. Parrish,* 254 N.C. 301, 118 S.E. 2d 786 (1961). Indeed, the touchstone of due process is the presence of fundamental fairness in any judicial proceeding adversely affecting the interests of an individual.

Right to counsel cases analyzed in terms of constitutional mandates of due process require the application of a balancing test to determine the amount of process due an indigent to ensure fundamental fairness. *Lassiter v. Department of Social Services,* --- U.S. --- , 68 L.Ed. 2d 640, 101 S.Ct. 2153 (1 June 1981). The old distinction of appointing counsel only in criminal cases and never in civil cases was abandoned by the United States Supreme Court in *In re Gault,* 387 U.S. 1, 18 L.Ed. 2d 527, 87 S.Ct. 1428 (1967). In *In re Long,* 25 N.C. App. 702, 214 S.E. 2d 626 (1975), this Court quoted with approval the Tenth Circuit's statement that "[i]t matters not whether proceedings be labeled 'civil' or 'criminal' or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of [a grievous loss]. . . which commands observance of the constitutional safeguards of due process." *Id.* at 706, 214 S.E. 2d at 628, *quoting Heryford v. Parker,* 396 F. 2d 393, 396 (10th Cir. 1968).

The analysis utilized by the United States Supreme Court in the recent decision of *Lassiter* to determine the right of indigents to appointed counsel in termination of parental rights hearings is useful to our inquiry. The *Lassiter* analysis begins with "the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he *may* be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured." --- U.S. --- , 68 L.Ed. 2d at 649, 101 S.Ct. at 2159 (emphasis added). The

Supreme Court then applies a balancing test, first propounded in *Mathews v. Eldridge,* 424 U.S. 319, 47 L.Ed. 2d 18, 96 S.Ct. 893 (1976), which requires the evaluation of three distinct factors in determining what procedures are necessary under the Fourteenth Amendment to ensure fundamental fairness. The test is also helpful in applying the due process protections of our State constitution. The three factors are:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 47 L.Ed. 2d at 33, 96 S.Ct. at 903. *See also Parham v. J. R.,* 442 U.S. 584, 61 L.Ed. 2d 101, 99 S.Ct. 2493 (1979); *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 53 L.Ed. 2d 14, 97 S.Ct. 2094 (1977). Finally, the Court in *Lassiter* balances these *Mathews v. Eldridge* factors against one another "and then set[s] their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." *Lassiter,* --- U.S. at --- , 68 L.Ed. 2d at 649, 101 S.Ct. at 2159.

## II

An action to establish paternity is civil in nature, *Bell v. Martin,* 299 N.C. 715, 264 S.E. 2d 161 (1980), with no *immediate* threat to personal liberty. It is not a crime in North Carolina to sire an illegitimate child or to be adjudicated the father of the child. *Id.* The civil nature of a paternity action then raises the presumption that there is no right to appointed counsel in such a proceeding. *Lassiter.* The ramifications of a paternity determination, however, are decidedly criminal in nature.[2] The failure of the defendant in a paternity suit to make subsequent support payments based on the adjudication of his parentage can, and often does, result in civil or criminal enforcement proceedings being brought against him. The

---

2. See Section II-A, *infra.*

penalty imposed in these proceedings is incarceration. *See* G.S. 49-2 (1979 Cum. Supp.), 49-8, 49-15, 50-13.4(f)(9) (1979 Cum. Supp.). Hence, we analyze the due process requirements of *Mathews v. Eldridge* against, at best, a weakened presumption that court-appointed counsel is not necessary in a paternity proceeding.

### A. Interests of the Defendant

The first prong of the *Mathews v. Eldridge* test—the determination of the amount. of due process necessary to ensure fundamental fairness—concerns the private interests of the defendant that are placed in jeopardy. The personal freedom of the defendant is the most significant and steadfastly-guarded interest to be considered.

### 1. Liberty Interest

The defendant contends that his freedom is at stake in this civil paternity proceeding because a judgment of paternity will be *res judicata* in any subsequent proceeding to enforce his obligations to make support payments or to punish him for refusing to make support payments. Under North Carolina law, a defendant's liberty interest may be adversely affected in two ways by a civil adjudication of paternity. First, G.S. 49-15 provides that once paternity has been determined, the duties and obligations of the adjudicated father may be "enforced in the same manner, as if the child were the legitimate child of such father." The parental obligations owed a legitimate child may be enforced in a proceeding for civil or criminal contempt under G.S. 50-13.4(f)(9). Therefore, once adjudicated the father of the illegitimate child and ordered to pay child support in a proceeding without benefit of counsel, defendant may be incarcerated under the contempt provisions of G.S. 50-13.4(f)(9) for failure to make such payments. Second, it is a misdemeanor for a parent to fail to adequately support his or her illegitimate child, G.S. 49-2 (1979 Cum. Supp.), and the penalty for this offense may be a prison term "not to exceed six months." G.S. 49-8(1). Moreover, failure to make the court-ordered support payments is a continuing offense which may result in successive six month terms of imprisonment. *See State v. Green,* 277 N.C. 188, 176 S.E. 2d 756 (1970).[3]

---

3. *State v. Green* was effectively reversed by *Argersinger v. Hamlin,* 407 U.S. 25, 32 L.Ed. 2d 530, 92 S.Ct. 2006 (1972) only on the issue of right to counsel for "petty" offenses.

The County argues on the other hand that an indigent defendant in a paternity suit has no liberty interest at risk. It argues further that the mere fact that an adjudicated father *may* face a criminal prosecution for subsequent failure to make support payments has no bearing on the parental adjudication proceeding. According to the County, a due process right to counsel does not depend upon the hypothetical and remote possibilities of future enforcement actions for nonsupport. The County also points out that defendant would have court-appointed counsel in a criminal nonsupport prosecution, *State v. Lee*, 40 N.C. App. 165, 252 S.E. 2d 225 (1979), and would be entitled to counsel in a criminal contempt proceeding. *Argersinger v. Hamlin*, 407 U.S. 25, 32 L.Ed. 2d 530, 92 S.Ct. 2006 (1972). Moreover, the County contends, based on *Tidwell v. Booker*, 290 N.C. 98, 225 S.E. 2d 816 (1976), that the civil adjudication of paternity would not be *res judicata* in a subsequent criminal proceeding and that defendant would be able to raise the issue of paternity again.

Our reading of *Tidwell* and the more recent decisions of this Court in *Withrow v. Webb*, --- N.C. App. --- , 280 S.E. 2d 22 (1981) and *Williams v. Holland*, 39 N.C. App. 141, 249 S.E. 2d 821 (1978), convinces us that the adjudication of paternity in this action will be *res judicata* in a subsequent criminal proceeding. *Tidwell* is distinguishable from, and therefore not controlling on, the case *sub judice* because of the lack of identity of parties in the two proceedings in *Tidwell.* In that case, the issue of paternity had first been raised in a criminal prosecution. The plaintiff-wife swore out a warrant against the putative father for nonsupport and the *State* successfully prosecuted the case. In that trial, defendant was found to be the father and therefore criminally liable for nonsupport. Over ten years later the plaintiff-*wife* filed a civil Complaint in her name alleging the paternity of the defendant and requesting additional support payments of fifty dollars per week. The trial court refused to let defendant contest paternity and ordered that the payments be made. On appeal, the North Carolina Supreme Court reversed the civil judgment on the grounds that defendant should have been permitted to deny paternity. The Court specifically held "that, for the reason that the parties to the criminal and civil proceedings are not the same and the State and this plaintiff are not in privity, the defendant is not estopped in this present action to deny paternity. . . ." 290 N.C. at 114, 225 S.E. 2d at 826.

In the case before us, the State, through its subdivision (County), is the real party in interest in the civil paternity proceeding. Likewise, the State would be the prosecuting party in a criminal contempt *or* nonsupport hearing. The County's contention that it is not a party to the civil paternity action belies the reality of the AFDC situation. By virtue of accepting AFDC funds, Ms. Carrington's right to bring suit for support from the child's father is automatically assigned to the County. 42 U.S.C. § 651 *et seq.;* G.S. 110-128 (1979 Cum. Supp.). The County has a statutory duty to bring paternity proceedings against, and to establish support obligations from, putative fathers. G.S. 110-138, 139 (1979 Cum. Supp.). The County brings suit in its name, ostensibly on behalf of the mother and child. In actuality, under G.S. 110-128 and 110-135, the payment of AFDC funds by the State creates a debt owing to the State by the responsible parents of the child. Under our State's public assistance statutes, the mother receiving AFDC funds must cooperate with the County by giving the name and by assisting in the location of the nonsupporting, putative father. G.S. 110-131. The mother's failure to cooperate will result in her ineligibility for future AFDC funds. *Id.* In short, the State has an active and vested interest in paternity proceedings involving mothers and children receiving AFDC funds. As was found in *Little v. Streater,* it is clear that "the State's involvement in this paternity proceeding was considerable and manifest, giving rise to a constitutional duty" to provide court-appointed counsel. --- U.S. at --- , 68 L.Ed. 2d at 634, 101 S.Ct. at 2207; *see also Madeline G. v. David R.,* 95 Misc. 2d 273, --- , 407 N.Y.S. 2d 414, 416 (Family Ct. 1978). As a real party in interest, the State would be able to assert successfully the doctrine of *res judicata* in a subsequent criminal prosecution. Indeed, G.S. 110-132 specifically provides that a judgment of paternity, based on an acknowledgment by the father, is *"res judicata* as to that issue and shall not be reconsidered· by the court."

In an indirect, but nonetheless significant way, the indigent defendant in a paternity action instituted by the County has his liberty placed in jeopardy. The availability of court-appointed counsel at the subsequent criminal proceeding comes too late. Counsel is of little value to the indigent defendant at that time because his best defense—denial of paternity—has already been determined at a prior hearing in which all the resources and ex-

pertise of the State were brought to bear on the unrepresented, indigent defendant. Defendant may be sent to jail without ever having had a *meaningful* opportunity to be heard on the issue of paternity. We agree with former Chief Justice Sharp who dissented in *State v. Green*:[4] "In common parlance, '[i]t's at that first trial [civil paternity hearing] a man needs a lawyer." 277 N.C. at 197, 176 S.E. 2d at 762. Moreover, it should be pointed out that in *Withrow v. Webb* and *Williams v. Holland* this Court cited with approval the principle

> [t]hat a judgment rendered by a court having jurisdiction to do so finding paternity to exist bars the relitigation of that issue by the parties to the original judgment is a well established rule of law in other jurisdictions that have considered the question. [Citations omitted.]

*Williams*, 39 N.C. App. at 147, 249 S.E. 2d at 825-26; *Withrow*, --- N.C. --- , 280 S.E. 2d at 24. *See also Brondum v. Cox*, 30 N.C. App. 35, 226 S.E. 2d 193 (1976), *aff'd.*, 292 N.C. 192, 232 S.E. 2d 687 (1977). The defendants in *Williams* and *Withrow* were prohibited from raising the issue of paternity at a proceeding subsequent to the one in which paternity was established. The doctrine of *res judicata* applied to bar relitigation of the issue of paternity which was raised in a prior proceeding *involving the same parties.*[5] *See generally Taylor v. Taylor*, 257 N.C. 130, 125 S.E. 2d 373 (1962).

## 2. Property and Familial Interest

Other important personal interests are at stake in a paternity suit. For example, defendant has several property interests at stake. An adjudication of paternity can mean up to eighteen years of child support payments — not an insubstantial amount. Moreover, paternity necessarily affects the distribution of defendant's estate upon death, G.S. 29-1, *et seq.;* Workers' Compensation

---

4. See Footnote 3, *supra.*

5. Other states have recognized the *res judicata* effect of a paternity determination in a subsequent criminal nonsupport action. In several of these jurisdictions, the courts have found a right to appointed counsel in AFDC-related paternity actions instituted by the state. *See Artibee v. Circuit Judge*, 397 Mich. 54, 243 N.W. 2d 248 (1976); *Reynolds v. Kimmons*, 569 P. 2d 799 (Alaska 1977); *Salas v. Cortez*, 24 Cal. 3d 22, 593 P. 2d 226, 154 Cal. Rptr. 529 (1979).

benefits, G.S. 97-1; Social Security benefits, 42 U.S.C. ·402(d)(1); and insurance proceeds.

Paternity also has a direct effect on the family unit by creating a parent-child relationship. As pointed out in *Little v. Streater*, "[j]ust as the termination of such [family] bonds demands procedural fairness, [citation omitted], so too does their imposition." --- U.S. at --- , 68 L.Ed. 2d at 637, 101 S.Ct. at 2209. A paternity adjudication can also seriously damage the reputation of the defendant and have a deleterious effect on an already established family of the defendant. *See Hepfel v. Bashaw*, 279 N.W. 2d 342, 345 (Minn. 1979).

It has been rightly noted that a paternity adjudication dramatically affects the personal interest of the child as well. "[I]t must now be accepted that the child's interest in an accurate determination of paternity at least equals that of the putative father." 279 N.W. 2d at 346; Krause, Illegitimacy: Law and Social Policy 108 (1971). The child's rights of support, inheritance and custody are directly affected by a paternity proceeding. More important, the child's health interests are involved. An accurate family medical history can be critical in the diagnosis and treatment of a child's injuries and illnesses.

"The [property and familial] interests implicated here are substantial." *Little v. Streater*, --- U.S. at --- , 68 L.Ed. 2d at 637, 101 S.Ct. at 2209.

### B. Risks of an Erroneous Adjudication of Paternity

The second prong of the *Mathews v. Eldridge* test requires an analysis of the risk that the procedures used will lead to an erroneous determination of paternity, and an analysis of the value of granting the defendant additional procedural safeguards such as appointed counsel. Without counsel to advise an indigent defendant in a paternity suit of his right to a blood grouping test, to conduct vigorous cross-examination of the State's key witness and to assist the defendant through the complexities of the paternity hearing, the risk of an erroneous adjudication of parentage is great.

The frequently cited study made by Professor Harry D. Krause bears witness to the tremendous potential for erroneous adjudications of paternity. Krause's research revealed that it is

not uncommon for 95% of paternity disputes to result in findings of parentage. Yet, in a study based on 1000 cases, 39.6% of the accused men were conclusively shown by blood tests not to be the fathers. Of equal significance is another study in which 18% of a group of accused men who acknowledged paternity were proven by blood tests not be the fathers of the children they acknowledged. Krause, Illegitimacy: Law and Social Policy 149-51 (1971).

The reasons for erroneous accusations made by mothers of illegitimate children are not altogether clear. As noted by the California Supreme Court:

> There are many reasons why the man named by a mother as the father of her child may not necessarily be the father. She may simply not know which of several possible men is in fact the father. Additionally, she may wish to protect the actual father or protect herself from retribution from him. (See generally, Poulin, *Illegitimacy and Family Privacy* (1976) 70 Nw. U. L. Rev. 910, 923-24). Since cooperation with the district attorney is mandatory for women receiving AFDC, a mother may also simply supply a name in order to avoid termination of welfare benefits. (Gliaudys, *supra,* 53 State Bar J. at p. 322). Further, studies have shown that much testimony regarding the parties' sexual contacts in paternity suits is unreliable. (See Krause, Illegitimacy: Law and Social Policy (1971), pp. 107-108).

*Salas v. Cortez,* 24 Cal. 3d at 31 n.7, 593 P. 2d at 232 n.7, 154 Cal. Rptr. at 535 n.7.

Moreover, many indigent defendants are illiterate and unfamiliar with judicial process. As a result, they are often unable to appreciate fully the significance of the proceeding against them and unable to understand the requests for admissions, interrogatories and requests for documents. Failure to answer these discovery requests can be used against the defendant; in fact, failure to respond to a request for admission of paternity may even be deemed as true, thereby "resolving" the ultimate issue in the case. G.S. 1A-1, Rule 36.

In *Little v. Streater,* the United States Supreme Court held that an indigent defendant who faces the State in a paternity suit has, upon demand, a constitutional right to a free blood grouping

test. In the Court's opinion, ". . . access to blood grouping tests for indigent defendants . . . would help to insure [sic] the correctness of paternity decisions. . . ." --- U.S. at --- , 68 L.Ed. 2d at 637, 101 S.Ct. at 2209. In finding a due process right to free blood tests, the Court used the *Mathews v. Eldridge* test to analyze the paternity adjudication procedures involved.

In our opinion, an indigent defendant's right to a free blood grouping test may be rendered meaningless without counsel to advise him of his right to demand such a test, to explain the test's significance, to ensure that the test is properly administered and to ensure that the results are properly admitted into evidence. As pointed out by the Supreme Court of Minnesota "the importance of blood tests magnifies the necessity for the timely assistance of counsel, to ensure that the defendant is apprised of his right to request blood tests and to inform him of their significance." *Hepfel v. Bashaw*, 279 N.W. 2d at 347-48.

For the unrepresented indigent defendant in a paternity suit, the complexities of a jury trial provide another barrier to his "meaningful opportunity to be heard." In an AFDC situation, the State attorney has available unlimited resources and expertise while the defendant has no money, little, if any, experience with the judicial process, and no one to help represent his interests. In short, "the full power of the state is pitted against an indigent person in an adjudication of the existence of a fundamental biological relationship entailing serious financial, legal and moral obligations." *Salas v. Cortez*, 24 Cal. 3d at 32, 593 P. 2d at 233, 154 Cal. Rptr. at 536.

The additional safeguard of appointing counsel to indigent defendants in paternity suits would greatly reduce the risk of erroneous determinations of paternity.

> [B]y intervening heavily on behalf of one side in what has traditionally been a private dispute, the state has skewed the outcome of the case. The chances that the significant consequences of fatherhood will be imposed on an innocent man obviously increase dramatically if, because he is unable to afford counsel, the defendant offers no defense. They increase still further if counsel for the plaintiff [the State] is a specialist in prosecuting such claims. . . . Unless the rights of indigent paternity defendants are protected, courts risk find-

ing not the right man, but simply the poorest man to be the father of a child.

24 Cal. 3d at 31, 593 P. 2d at 232, 154 Cal. Rptr. at 535.

Because of the risk associated with relying on the present procedural safeguards, we find ourselves in agreement with the Minnesota Supreme Court: "the *accurate* determination of paternity, given the present adversary nature of the proceeding, is best promoted by a system that ensures the competent representation of both sides to the controversy." *Hepfel v. Bashaw*, 279 N.W. 2d at 347 (emphasis added).

## C. Interests of the Government

The last prong of the *Mathews v. Eldridge* test focuses on the interests of the government. The government interests are primarily two-fold: economic and minimization of litigation. Requiring the State to pay for court-appointed counsel will most likely increase the costs of establishing the paternity of a child receiving public assistance.[6] This increase in cost, however, must be weighed against the State's and the defendant's interest in an accurate determination of paternity. The fairer and more accurate fact-finding which will result from equal representation may encourage the man finally adjudged the father to make support payments. Understandably, a person erroneously determined to be the father will be less likely to maintain support payments to a child he knows is not his. *See State v. Camp*, 299 N.C. 524, 263 S.E. 2d 592 (1980). Moreover, "[a]ppointment of counsel need not lead to protracted litigation. . . . Faced with strong scientific evidence of paternity, many defendants [after having participated in and been represented by counsel in pre-trial discovery] arrive

---

6. It is important to note, however, that the North Carolina State Department of Human Resources collects on the average three dollars ($3) for every one dollar ($1) paid out in AFDC funds. North Carolina Department of Human Resources, Child Support Collection Statistics (1979). Equally important is the will of the people, expressed through the Legislature, to shoulder the additional cost of appointed counsel in closely-related proceedings. After the United States Supreme Court held, in *Lassiter v. Dept. of Social Services*, that the due process clause of the Fourteenth Amendment does not *require* the appointment of counsel for indigent parents in every parental status determination proceeding, the North Carolina General Assembly, on 10 July 1981, passed an act requiring the appointment of counsel for indigent parents in parental rights termination proceedings. Rat. Ch. 0966.

at a settlement with the district attorney without the expense of a trial." *Salas v. Cortez*, 24 Cal. 3d at 33, 593 P. 2d at 234, 154 Cal. Rptr. at 536-37. The State's financial and administrative interests, while important, are not "significant enough to overcome private interests as important as those here. . . ." *Lassiter v. Dept. of Social Services*, --- U.S. --- , 68 L.Ed. 2d at 650, 101 S.Ct. at 2160.

### III

The final step in concluding our analysis is to balance the three *Mathews v. Eldridge* factors against one another and then weigh them collectively against the weakened presumption in this case that no right to appointed counsel exists in a civil paternity suit instituted by the State. On the imaginary scales of justice, the defendant's substantial liberty, property and familial interests (*see* IIA, *supra*); the significant risk of an erroneous adjudication of paternity under the present procedures (*see* IIB, *supra*); and the State's minimal counterveiling monetary interests (*see* IIC, *supra*) overwhelm the already weakened presumption against the right to appointed counsel in cases of this nature. When the State marshalls its many resources against an indigent defendant to have him adjudicated the father of the child receiving public assistance, that defendant is entitled to the protection afforded by court-appointed counsel based on the due process clause of the Fourteenth Amendment *and* on the Law of the Land provision of the North Carolina Constitution.

Our decision is not inconsistent with existing case law in North Carolina. Although the State cites *Jolly v. Wright*, 300 N.C. 83, 265 S.E. 2d 135 (1980) for purposes of analogy, our reading of that case is supportive of our holding. The State contends that *Jolly* stands for the proposition that court-appointed counsel is not constitutionally mandated in a civil contempt proceeding, and therefore, by analogy, court-appointed counsel should not be required in a paternity suit. The Court in *Jolly*, however, said only that counsel is not *automatically* required in a civil contempt proceeding; each proceeding must be evaluated on a case-by-case basis. 300 N.C. at 93, 265 S.E. 2d at 143. *See also Gagnon v. Scarpelli*, 411 U.S. 778, 36 L.Ed. 2d 656, 93 S.Ct. 1756 (1973). The Court did not feel compelled to appoint counsel in *Jolly* because of the relatively simple, uncomplicated nature of the civil con-

tempt proceeding. The Court's actual holding is that "due process requires appointment of counsel for indigents in nonsupport civil contempt proceedings only in those cases where assistance of counsel is necessary for an adequate presentation of the merits, or to otherwise ensure fundamental fairness." 300 N.C. at 93, 265 S.E. 2d at 143. Given the fundamental rights at stake, and the complex nature of a paternity suit, we see our holding as consistent with our Supreme Court's concern for an adequate and fundamentally fair presentation of the merits in these types of civil proceedings.

Our decision today also has support in other jurisdictions. In *Salas v. Cortez* and *Madeline G. v. David R.*, the courts held that the defendant in a state-instituted paternity case had a Fourteenth Amendment due process right to counsel. In *Artibee v. Circuit Judge*, 397 Mich. 54, 243 N.W. 2d 248 (1976), and *Reynolds v. Kimmon*, 569 P. 2d 799 (Alaska 1977), the courts also found a right to counsel but based the right on state constitutional due process grounds. In *Hepfel v. Bashaw*, the court did not reach the questions of the constitutionality of court appointed counsel in paternity cases brought by the State but instead ordered counsel appointed based on its supervisory powers to ensure the fair administration of justice. *See generally*, Annot. 4 A.L.R. 4th 363 (1981). In addition, the National Conference of Commissioners on Uniform State Laws has proposed a Uniform Parentage Act which specifically provides for court-appointed counsel to indigent persons unable to pay for counsel. The Uniform Parentage Act § 19(a) (1973). Four state legislatures have adopted the Act: Hawaii (Hawaii Rev. Stat. § 584-19 (1975)); Montana (Mont. Rev. Codes Ann. § 40-6-119 (1975)); North Dakota (N.D. Cent. Code § 14-17-18 (Supp. 1977)); and Wyoming (Wyo. Stat. § 14-2-116 (1977)).

An adjudication of paternity imposes on an individual duties and obligations of great significance. For the accused father, a paternity proceeding puts at risk his liberty, his property and his family relationships. When these interests are threatened by the powers of the State, our federal and state constitutions require that certain basic procedural due process protections be afforded so that the individual has a meaningful opportunity to be heard. Given the interests involved in, and the implications of, a paternity proceeding, court-appointed counsel for the indigent defendant

is essential to his having a *meaningful* opportunity to be heard. We must not be niggardly or equivocal in appointing counsel for indigents when rights as fundamental as these are at stake. Due process and basic, fundamental fairness demand that counsel be appointed in paternity suits instituted by the State. In reaching this decision, we find it necessary to reverse the judgment of the trial court and remand for a new paternity hearing only after the trial court appoints counsel for the defendant.

Reversed and remanded.

Judge WHICHARD concurs.

Judge MARTIN (Robert M.) dissents.