Argued and submitted February 17, affirmed May 12,
reconsideration denied September 2,
petition for review denied October 26, 1982 (293 Or 801)

# STATE ex rel ADULT AND FAMILY
# SERVICES DIVISION,
### *Respondent,*

*v.*

# STOUTT,
### *Appellant.*

## (No. D8002-60802, CA A20557)

644 P2d 1132

Andrew R. Gardner, Cooperating Attorney, American Civil Liberties Union, Portland, argued the cause and filed the briefs for appellant.

Jan Peter Londahl, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Petitioner, a state agency, initiated this filiation proceeding pursuant to ORS 109.125(1)(b),[1] alleging that defendant is the father of a child who was born out of wedlock and to whose support petitioner contributes. Defendant appeals from the trial court's judgment finding him to be the child's father. His only argument on appeal is that, because he is indigent, his Fourteenth Amendment due process rights and his rights under Article I, Section 11 of the Oregon Constitution were violated by the denial of his request for court-appointed counsel.[2] We affirm.

In their arguments on the due process issue, the parties focus on *Little v. Streater,* 452 US 1, 101 S Ct 2202, 68 L Ed 2d 627 (1981), and *Lassiter v. Department of Social Services,* 452 US 18, 101 S Ct 2153, 68 L Ed 2d 640 (1981). In *Little,* the Supreme Court held that the indigent defendant in a Connecticut paternity suit had a due process right to a blood grouping test at public expense. *Lassiter* was a termination of parental rights case in which the indigent mother argued that she was entitled to a court-appointed attorney. The court held, generally, that whether due process requires free counsel in termination proceedings must be determined on a case-by-case basis and, specifically, that the mother there was not entitled to appointed counsel.

---

[1] ORS 109.125(1)(b) provides:

"(1) Any of the following may initiate proceedings under this section:

"* * * * *

"(b) Any state agency, if furnishing support to the mother for the benefit of the child or if furnishing services or assistance of any kind because of the birth, or impending birth, of the child;

"* * * * *"

[2] Although defendant attended the adjudicative hearing, he had not responded to petitioner's request for admissions. ORCP 45. The hearing was therefore conducted as a default proceeding, notwithstanding defendant's presence. At the conclusion of the hearing, the trial judge orally announced his finding of paternity, but he allowed defendant 30 days to engage a lawyer and to present denials and a "defense other than that of bare denial."

We understand that defendant then contacted the American Civil Liberties Union and that that organization agreed to provide counsel to represent him solely on the issue of his entitlement to court-appointed counsel. The attorney presented argument on that issue in the trial court and now represents defendant in this appeal from the trial judge's denial of the request for appointed counsel.

The Court stated:

"In sum, the Court's precedents speak with one voice about what 'fundamental fairness' has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

"The case of *Mathews v. Eldridge,* 424 U.S. 319, 335, [96 S Ct 893, 47 L Ed 2d 18 (1976),] propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.

"* * * * *

"If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since 'due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,' *Gagnon v. Scarpelli, supra,* 411 U.S. [778] at 788, [93 S Ct 1756, 36 L Ed 2d 656 (1973),] neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding. We therefore adopt the standard found appropriate in *Gagnon v. Scarpelli,* and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review. * * *" 452 US at 26-27, 31-32.

The Court then concluded that, in light of the procedural and evidentiary factors involved in the case before it, denial of court-appointed counsel did not violate the mother's due process rights. It stated:

"* * * The Department of Social Services was represented at the hearing by counsel, but no expert witnesses testified, and the case presented no specially troublesome points of law, either procedural or substantive. While hearsay evidence was no doubt admitted, and while Ms. Lassiter no doubt left incomplete her defense that the Department had not adequately assisted her in rekindling her interest in her son, the weight of the evidence that she had few sparks of such an interest was sufficiently great that the presence of counsel for Ms. Lassiter could not have made a determinative difference. True, a lawyer might have done more with the argument that William should live with Ms. Lassiter's mother—but that argument was quite explicitly made by both Lassiters, and the evidence that the elder Ms. Lassiter had said she could not handle another child, that the social worker's investigation had led to a similar conclusion, and that the grandmother had displayed scant interest in the child once he had been removed from her daughter's custody was, though controverted, sufficiently substantial that the absence of counsel's guidance on this point did not render the proceedings fundamentally unfair. * * *" 452 US at 32-33.[3]

In *Little,* the defendant sought an order in the trial court that blood grouping tests be performed on the mother and child and that, in light of the defendant's indigency, the state be required to pay for the tests. The Court authorized the tests; however, relying on a Connecticut statutory requirement that "[t]he costs of making such tests shall be chargeable against the party" moving for them, the Court declined to order that the state pay. Consequently, the tests were not performed. The defendant was found to be the father.

In considering whether the defendant had a due process right to a blood test at state expense in a state-initiated paternity proceeding, the Supreme Court applied the three-factor test of *Mathews v. Eldridge,* 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976), as it had in *Lassiter.* The Court first concluded that the private interests involved were substantial and then explained:

---

[3] In *State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968), the Supreme Court held that indigent parents in termination cases have a general due process right to the appointment of counsel. We are not called upon in this case to decide whether or in what ways *Jamison* is affected by *Lassiter.*

"* * * Apart from the putative father's pecuniary interest in avoiding a substantial support obligation and liberty interest threatened by the possible sanctions for noncompliance, at issue is the creation of a parent-child relationship. This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. * * * Just as the termination of such bonds demands procedural fairness, see *Lassiter v. Department of Social Services,* [452 U.S.] 18, [101 S Ct 2153, 68 L Ed 2d 640 (1981),] so too does their imposition. Through the judicial process, the State properly endeavors to identify the father of a child born out of wedlock and to make him responsible for the child's maintenance. Obviously, both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination." (Footnote omitted.) 452 US at 13.[4]

The Court acknowledged that the state has a legitimate interest in having "paternity actions in which it is involved proceed as economically as possible," 452 US at 14, but concluded that

" * * * the State's monetary interest 'is hardly significant enough to overcome private interests as important as those here.' *Lassiter v. Department of Social Services, [supra,]* at 28." 452 US at 16.

As we read *Little,* however, the principal basis for the Court's decision was that blood grouping tests were critical to avoid error in the paternity determination, given the Connecticut statutory scheme. The Court pointed to the high degree of reliability of the tests in negating paternity. It then noted that, under the applicable state statutes as interpreted by the Connecticut courts, the mother's testimony is sufficient to establish a prima facie case, and

"* * * the defendant in a paternity suit is placed at a distinct disadvantage in that his testimony alone is insufficient to overcome the plaintiff's prima facie case.

---

[4] Were it not for the Supreme Court's contrary determination, we perhaps would agree with petitioner's contention that a putative father's interest in a paternity decision is not nearly as substantial as a parent's interest in a termination decision. Although the Supreme Court characterizes the decision in a contested paternity case as establishing a parent-child relationship, that relationship is almost certain to remain an unwanted one on the part of the father and one which offers no nurturing to the child. Conversely, a parent who resists termination of his or her rights in a child has an interest which goes well beyond that of a putative father who seeks to avoid the adjudication of and responsibility for his parental status.

Among the most probative additional evidence the defendant might offer are the results of blood grouping tests, but if he is indigent, the State essentially denies him that reliable scientific proof by requiring that he bear its cost. See Conn. Gen. Stat. § 46b-168 (1981). In substance, the State has created an adverse presumption regarding the defendant's testimony by elevating the weight to be accorded the mother's imputation of him. If the plaintiff has been 'constant' in her accusation of paternity, the defendant carries the burden of proof and faces severe penalties if he does not meet that burden and fails to comply with the judgment entered against him. Yet not only is the State inextricably involved in paternity litigation such as this and responsible for an imbalance between the parties, it in effect forecloses what is potentially a conclusive means for an indigent defendant to surmount that disparity and exonerate himself. Such a practice is irreconcilable with the command of the Due Process Clause." 452 US at 12.

The Court held that, *"in these specific circumstances,* the application of Conn. Gen. Stat. § 46b-168 (1981) to deny appellant blood grouping tests because of his lack of financial resources violated the due process guarantee of the Fourteenth Amendment." 452 US at 16-17. (Emphasis added; footnote omitted.)

The circumstances here differ from those in *Little* in two significant respects: first, the cost to the state of providing court-appointed counsel would obviously be substantially greater than the cost of providing blood grouping evidence; and, second, the evidentiary scheme in Oregon paternity cases does not create a presumption against the defendant, based on the mother's testimony, which he cannot rebut by his own testimony. Indeed, ORS 109.155(1) does essentially the opposite, by providing:

"The court or the jury, in a private hearing, shall first determine the issue of paternity. If the defendant admits the paternity, such admission shall be reduced to writing, verified by the defendant and filed with the court. *If the paternity is denied, corroborating evidence, in addition to the testimony of the parent or expectant parent, shall be required."* (Emphasis added.)

■ ■ Read most favorably to defendant's position, *Little* and *Lassiter* say that a defendant's private interests in a

state-initiated paternity proceeding are substantial enough to necessitate consideration of whether particular procedural protections are required in any given case and that one of the protections which must be considered is the appointment of counsel if the defendant is indigent. As indicated in *Lassiter,* the due process considerations favoring the individual proceeded against must be sufficient to overcome the presumption that appointed counsel is required only in cases where the indigent, if unsuccessful, may lose his personal freedom. For reasons similar to the Court's in *Lassiter,* we conclude that due process did not require the appointment of an attorney for defendant in this case.

The Court observed in *Lassiter* that:

"* * * [T]he ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uncounseled parent is evident from the findings some courts have made. * * *" 452 US at 30.

It nevertheless concluded that the issues and procedures in that case were such that "the presence of counsel * * * could not have made a determinative difference." 452 US at 32-33.[5]

---

[5] After this case was submitted, the United States Supreme Court held in *Santosky v. Kramer,* ___ US ___, 102 S Ct 1388, 71 L Ed 2d ___ (1982), that "due process requires that the State support its allegations by at least clear and convincing evidence" in parental rights termination cases. ___ US at ___. The court noted in *Kramer:*

"In *Lassiter,* to be sure, the Court held that fundamental fairness may be maintained in parental rights termination proceedings even when some procedures are mandated only on a case-by-case basis, rather than through rules of general application. 452 U. S., at 31-32 (natural parent's right to court-appointed counsel should be determined by the trial court, subject to appellate review). But this Court never has approved case-by-case determination of the proper *standard of proof* for a given proceeding. Standards of proof, like other 'procedural due process rules[,] are shaped by the risk of error inherent in the truth-finding process as applied to the *generality of cases,* not the rare exceptions.' *Mathews v. Eldridge,* 424 U.S., at 344 (emphasis added).

Paternity cases, like termination proceedings, can sometimes present complex questions of fact or law. This case did not. The mother testified that she was having sexual relations with defendant on a regular basis at the time of conception and that she was not having sexual relations with anyone else.[6] In his testimony at the hearing and in his deposition, defendant also testified that he was having sexual relations with the mother during the month of probable conception and the months preceding and following. At the hearing, he stated that no prophylactic measures were used. In his deposition, defendant gave as the reason for his denial of paternity that the mother was going out with other men at the approximate time of conception. However, there was nothing in his testimony to suggest that the mother had intercourse with the other men, and defendant's implied speculation that intercourse might have taken place does not refute the mother's specific testimony that she did not have relations with other men.

Defendant contends that

"[t]he state's reliance on the record as a basis for disregarding the due process implications of this case, fails

---

Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard." ___ US at ___. (Footnote omitted; emphasis in original.)

The court also distinguished between the effect on the state's fiscal interests of requiring appointed counsel versus requiring a clear and convincing evidence standard of proof:

"Unlike a constitutional requirement of hearings, see, *e.g., Mathews v. Eldridge,* 424 U. S., at 347, or court-appointed counsel, a stricter standard of proof would reduce factual error without imposing substantial fiscal burdens upon the State. * * *" ___ US at ___.

[6] Defendant argues:

"* * * [The mother's] testimony on the issue of paternity is suspect. She merely affirmed leading statements of fact made by the state's attorney. Her entire testimony consisted of saying 'yes' or 'right' on twenty-one occasions and 'no' on one occasion. Given the fact that she was receiving public assistance, and therefore compelled to assist in the state's prosecution, her testimony is less than reliable."

Assuming *arguendo* that we *can* consider the credibility of the witness given the procedural history of this case, *see* n 2, *supra,* we are not persuaded that defendant's challenge to her reliability says anything more than that she, like most witnesses who are parties or the equivalent, was interested in the outcome of the proceeding and had consulted with the lawyer who called her before she testified.

by its own logic. The full record is ambiguous; but because Jeffrey Stoutt was not represented by counsel, the full record was never put before the trial court. Indeed the state's total reliance on the testimony of [the mother], in complete disregard of Mr. Stoutt's testimony, merely highlights the constitutional defects of the proceeding below. The trial court received only one side of the case - the state's side. Under the circumstances, the outcome was never in doubt.

"Thus the state is technically correct when it asserts 'the issues at the paternity hearing were quite simple * * *.' They were simple only because an experienced attorney appeared in an adversarial legal forum and opposed a 19-year-old indigent who never even completed high school. The state's attorney was the only individual adequately trained to present a case, so it is not surprising that he found the proceeding 'quite simple.' "

We do not agree with defendant that "[t]he full record is ambiguous." The portions of defendant's deposition testimony which were not before the trial court have been made part of the record here and, for the reasons we have noted, the deposition does not aid defendant. There is some logic to defendant's suggestion that it is circular to look to the record to determine whether counsel could have affected the result, when one of the principal missions of counsel in any litigation is to develop the record. However, the Supreme Court arrived at its holding in *Lassiter* by performing an after-the-fact analysis of the record. If anything, the facts and the issues here are even more clear-cut than those in *Lassiter*. We conclude that an attorney could have had little effect on the result in this proceeding and that defendant had no due process right to appointed counsel.[7]

Defendant's remaining argument is that Article I, Section 11 of the Oregon Constitution mandates the appointment of counsel for indigent defendants in paternity cases. That section provides, as relevant:

---

[7] Consequently, we do not decide whether due process *ever* requires the appointment of counsel in Oregon filiation proceedings. As we have noted, the difference between the Connecticut and Oregon statutes concerning proof of paternity and the difference in cost between appointed counsel and blood grouping tests make the *Little* decision less than conclusive in Oregon.

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *; to be heard by himself and counsel; * * *."

Defendant's basic theory is that paternity proceedings, though characterized as "civil," are "quasi-criminal" in nature,[8] and that an adjudication of paternity can lead to later criminal sanctions and contempt and other criminal or quasi-criminal proceedings in the event of nonsupport. Although defendant acknowledges that he would be entitled to appointed counsel in any subsequent criminal proceeding, he argues that

"* * * [a]t that point counsel could do nothing to affect the adjudication of paternity at the prior proceeding.

"Providing counsel at such a late stage of the interface between the state and the putative father is a symbolic act which gives the image of due process but contributes little to defendant's right to be heard on the substantive issues which resulted in the criminal exposure. In the prosecution of appellant for nonsupport, the major element of the crime, the obligation itself, would be established by the state through a civil proceeding where appellant was not represented by counsel and had no meaningful opportunity to defend himself."

■ Defendant's point is not well taken. Although paternity proceedings (like almost all other proceedings) do have ramifications which go beyond the immediate issues adjudicated in them, and those ramifications include the possibility that the court's order may not be complied with, we find the fact that criminal actions can follow from a violation of the court's order to be a peculiarly frail basis for claiming the right to criminal case protections in this civil proceeding.

Defendant analogizes paternity cases to the putatively "decriminalized" proceedings for driving under the influence of intoxicants (DUII) considered in *Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 570 P2d 52 (1977). The court held in *Brown* that first offense DUII cases

---

[8] In *State v. Morrow*, 158 Or 412, 75 P2d 737, 76 P2d 971 (1938), the Supreme Court held that a filiation proceeding did not have the effect of barring a later prosecution for statutory rape on grounds of former jeopardy, because the filiation proceeding was a civil one. The filiation statute in effect at that time differs from the present one, but paternity cases remain civil in nature under the current statutory scheme.

remained criminal in nature, notwithstanding the legislature's classification of the offense as a traffic infraction, and were therefore subject to the protections of Article I, Section 11. The court summarized the bases for its holding:

"* * * Nothing prevents such a decriminalization of traffic offenses, if it is fully carried out. Nor need it exclude the offense of driving under the influence of intoxicants. We hold only that, considering the magnitude of the potential fine, the secondary sanctions in case of non-payment, the relationship of DUII to the other major traffic offenses, the evident legislative desire to emphasize the seriousness of this offense while facilitating its punishment, and the retention of criminal law enforcement procedures, the 1975 code did not free this offense from the punitive traits that characterize a criminal prosecution. * * *" 280 Or at 110.

The characteristics of paternity cases are not comparable. Although support orders can be issued in paternity cases, as they can in dissolution and certain other civil proceedings, no penal fine can be imposed. A father of a child born out of wedlock is subject to judicial proceedings which can result in his being required to pay the same basic costs as fathers of legitimate children. If he fails to abide by that requirement, he confronts essentially the same ancillary risks as those which confront any parent who fails to support a child, see ORS 163.555, and any person who violates the order of a court in a civil proceeding. We conclude that Article I, Section 11 does not apply to this case. The trial court correctly denied the motion for court-appointed counsel.

Affirmed.[9]

---

[9] Some of the procedural events defendant's attorney refers to here to support the contention that a lawyer was essential to due process arguably could have been grounds for independent assignments of error. See n 2, supra. As noted, however, defendant's only contention on appeal and, apparently, the only contention he engaged his attorney to raise in this court is that he was entitled to court-appointed counsel in the trial proceedings. The issue defendant raises is an important one. Defendant's interests in other aspects of the trial and appeal of this case are also important.

It may be that the appropriate way for attorneys to make one-issue presentations of this kind is as amici curiae, after assuring that the party has been given suitable advice that raising other issues might be of greater immediate benefit to him and that organizations or private attorneys providing pro bono services may

**VAN HOOMISSEN, J.,** dissenting.

I respectfully dissent.

My experience as a trial judge on the Multnomah County Circuit Court, Department of Domestic Relations, satisfies me that it was "fundamentally unfair" to proceed to an adjudication of paternity in the absence of appointed counsel on the facts of this case. I would, therefore, reverse and remand for the appointment of counsel and a new trial. *Lassiter v. Department of Social Services,* 452 US 18, 101 S Ct 2153, 68 L Ed 2d 640 (1981); *Little v. Streater,* 452 US 1, 101 S Ct 2202, 68 L Ed 2d 627 (1981); *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976); *State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968).[1]

The state has chosen an adversarial forum to resolve this contested paternity dispute.[2] It has provided a deputy attorney general to prosecute the proceedings. It has fixed serious long term consequences to the outcome for both child and defendant, including the possibility of imprisonment for defendant should he willfully fail to pay child support. *See, e.g.,* ORS 109.103 (duty to support) and ORS 163.555 (criminal non-support). I conclude that due process mandates the appointment of counsel for this indigent defendant. U.S. Const. Amend XIV, § 1.[3]

---

be available to raise those issues and to act as the party's primary counsel. A failure to provide that advice can be as defeating to the party's ability to obtain meaningful representation as the absence of appointed counsel. We do not know whether defendant was so advised in this case, and we do not imply that he was not.

[1] *Accord Reynolds v. Kimmons,* 596 P2d 799 (Alaska 1977); *Salas v. Cortez,* 24 Cal 3d 22, 154 Cal Rptr 529, 593 P2d 226, *cert den* 444 US 900 (1979); *Hepfel v. Bashaw,* 279 NW2d 342 (Minn 1979); *M. v. S.,* 169 NJ Super 209, 404 A2d 653 (1979); *State ex rel. Graves v. Daugherty,* 266 SE2d 142 (W Va 1980).

[2] A filiation proceeding, ORS 109.124 *et seq,* has complex and immediate social and legal implications for the child, father, mother and the state. Mother and alleged father have conflicting interests and motives in such a proceeding. Both the child and the state have a substantial interest in seeing that paternity is established in the biological father and that a defendant who is in fact *not* the biological father should not be decreed to be the father.

[3] I have difficulty with footnotes 2 and 9 of the majority opinion about the role of defendant's counsel. The majority concedes that some of the procedural issues raised in defendant's brief "arguably could have been grounds for independent assignments of error." Here, the ACLU attorney entered the case solely to argue the right to counsel issue. He did not appear generally as counsel for defendant, and at no time has he represented him on the merits. Thus, defendant has not had counsel at trial or on appeal on the central issue in the case, *i.e.,* paternity.