[No. 11855-2-I. Division One. July 23, 1984.]

THE STATE OF WASHINGTON, ET AL, *Respondents,* v. HENRY JAMES, *Respondent,* RICHARD ESTEP, *Appellant.*

---

[2]What is now RCW 9A.44.100(2) was formerly codified as RCW 9A.88.100(2).

*Robert H. Stevenson,* for appellant.

*Seth Dawson, Prosecuting Attorney,* and *R. Scott Bowen* and *Jeanne A. Pascal, Deputies,* for respondents.

DURHAM, C.J.—Richard Estep appeals from a summary judgment of paternity and an order compelling blood tests. Estep alleges that, because he was indigent, he was entitled to appointed counsel under the due process clause of the federal constitution.

On August 21, 1980, the State filed a petition to establish the paternity of one Christopher George Johnson. The petition alleged that either Richard Estep or another named individual was the father. The State moved to have blood tests performed and, on February 20, 1981, an order was entered to that effect. The test results showed Estep had a paternity index of 3,770 to 1 and a plausibility of paternity of 99.97 percent. On July 24, 1981, the court granted the State's motion for summary judgment of paternity. The order stated that, based upon the test

results, Estep was the father. On September 22, 1981, an order was issued directing Estep to show cause why he should not pay reasonable child support.

Estep was unrepresented during these proceedings. Several continuances were granted to enable Estep to retain an attorney, and Estep's present counsel, Mr. Robert Stevenson, filed a notice of appearance on January 11, 1982. On January 20, 1982, Estep moved to vacate both the order awarding summary judgment and the order compelling a blood test. The motion stated that both orders were obtained while Estep was financially unable to retain an attorney, and that his requests for appointed counsel had been denied. Estep alleged that the orders were obtained without due process of law and, as such, were void. In an affidavit in support of his motion to vacate, Estep stated that he had only a 10th grade education, and had difficulty reading and writing. He further stated that he had so informed both the prosecutor and the court commissioner at the time the petition was filed, and that he had also apprised them of his indigence. Estep also alleged that he took the blood test because he was told that he would be jailed for contempt if he refused. On June 4, 1982, the court denied Estep's motion to vacate, and this appeal followed.

Estep's sole contention on appeal is that indigent defendants in paternity suits brought by the State are entitled to appointed counsel at the State's expense under the due process clause of the federal constitution.[1]

The fourteenth amendment to the United States Constitution provides, in part: "No state shall . . . deprive any person of life, liberty, or property, without due process of

---

[1]Although Estep's motion to vacate the order of summary judgment and the order compelling blood tests invoked both the state and federal constitutions, he does not specify on appeal which constitutional provision he relies upon. Insofar as Estep's opening brief cites only one case, *Salas v. Cortez*, 24 Cal. 3d 22, 593 P.2d 226, 154 Cal. Rptr. 529, *cert. denied*, 444 U.S. 900 (1979), which recognized a right to counsel in paternity cases based upon the federal and California due process clauses, we decline to consider if such a right is implicit in the due process clause of the Washington Constitution. Const. art. 1, § 3.

law . . .". U.S. Const. amend. 14, § 1. The concept of due process is not susceptible to precise definition. Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). Accordingly, the United States Supreme Court has held that:

> [D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a *meaningful* opportunity to be heard.

(Italics ours.) *Boddie v. Connecticut,* 401 U.S. 371, 377, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971).

In *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), the Supreme Court set forth the following test to determine when due process requires a certain procedural safeguard:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

It is clear that paternity proceedings are subject to the requirements of due process. *See Little v. Streater,* 452 U.S. 1, 68 L. Ed. 2d 627, 101 S. Ct. 2202 (1981) (indigent defendants in paternity proceedings entitled to blood grouping tests furnished at the state's expense). The question here is if due process mandates that indigent putative fathers are entitled to appointed counsel.

As noted above, the three *Eldridge* factors determine when a particular safeguard is required. However, in *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 26–27, 68 L. Ed. 2d 640, 101 S. Ct. 2153 (1981), the Supreme Court

held that, when it is asserted that due process requires appointed counsel, the *Eldridge* factors must be balanced against a presumption that an indigent litigant has such a right "only when, if he loses, he may be deprived of his physical liberty." *Lassiter,* 452 U.S. at 27. The *Lassiter* Court followed this approach in holding that parents in parental termination proceedings do not have an absolute right to appointed counsel. Although the Court recognized that the parent's interest is extremely important and that the State's interest is relatively weak, it stated that:

> [T]he complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

*Lassiter,* 452 U.S. at 31. Thus, although two of the *Eldridge* factors weighed in favor of appointed counsel, the Court was unable to quantify the risk of error inherent in termination of parental rights cases when the defendant lacks counsel. As a result, the Court declined to establish an absolute right to counsel in such cases, and instead held that the right to appointed counsel should be determined by the trial court on a case–by–case basis, subject to appellate review. *Lassiter,* 452 U.S. at 32.

Several states have considered when indigent putative fathers in paternity suits are entitled to appointed counsel. Prior to *Lassiter,* the majority of states held, on a variety of grounds, that indigent putative fathers in paternity cases are entitled to appointed counsel. *See Reynolds v. Kimmons,* 569 P.2d 799 (Alaska 1977) (ostensibly on state due process grounds, although court followed federal case law); *Salas v. Cortez,* 24 Cal. 3d 22, 593 P.2d 226, 154 Cal. Rptr. 529, *cert. denied,* 444 U.S. 900 (1979) (federal and state due process); *Hepfel v. Bashaw,* 279 N.W.2d 342, 4 A.L.R.4th 52 (Minn. 1979) (supervisory power); *Artibee v. Cheboygan Circuit Judge,* 397 Mich. 54, 243 N.W.2d 248 (1976) (state due process); *M. ex rel. T. v. S.,* 169 N.J. Super. 209, 404 A.2d 653 (1979) (unspecified basis); *State ex rel. Graves v. Daugherty,* 266 S.E.2d 142 (W. Va. 1980) (state due pro-

cess). *But see Sheppard v. Mack,* 68 Ohio App. 2d 95, 427 N.E.2d 522 (1980); *State v. Walker,* 87 Wn.2d 443, 553 P.2d 1093 (1976).[2]

However, the post–*Lassiter* decisions have uniformly analyzed the right to counsel in paternity proceedings under the *Eldridge/Lassiter* methodology. In so doing, the courts have sharply divided between recognizing an indigent's right to counsel in all such cases and adopting a case–by–case approach. *See Nordgren v. Mitchell,* 716 F.2d 1335 (10th Cir. 1983) (case–by–case approach); *Kennedy v. Wood,* ___ Ind. App. ___, 439 N.E.2d 1367 (1982) (absolute right to counsel when state is an adversary); *Wake Cy. ex rel. Carrington v. Townes,* 306 N.C. 333, 293 S.E.2d 95 (1982), *cert. denied,* 459 U.S. 1113 (1983) (case–by–case approach); *State ex rel. Adult & Family Servs. Div. v. Stoutt,* 57 Or. App. 303, 644 P.2d 1132 (1982) (case–by–case approach); *Corra v. Coll,* 305 Pa. Super. 179, 451 A.2d 480 (1982) (absolute right to counsel). *But see State ex rel. Hamilton v. Snodgrass,* 325 N.W.2d 740 (Iowa 1982) (completely rejecting right to counsel). Our application of the *Eldridge/Lassiter* test leads us to conclude that appointed counsel is not constitutionally required in all State–initiated paternity proceedings.

▪ The first *Eldridge* factor—the interests of the putative father affected by the paternity action—weighs in favor of recognizing a right to appointed counsel. In holding that due process entitles indigent defendants to free blood tests in paternity suits, the Supreme Court stated:

> Just as the termination of [familial] bonds demands procedural fairness, see *Lassiter* . . ., so too does their imposition. Through the judicial process, the State properly endeavors to identify the father of a child born out of wedlock and to make him responsible for the child's maintenance. Obviously, both the child and the defendant in a paternity action have a *compelling interest* in the accuracy of such a determination.

(Italics ours.) *Little,* 452 U.S. at 13. Moreover, a paternity

---

[2]See footnote 3, *infra.*

defendant has an obvious financial interest because, if he is adjudicated the father, the court is required to make provision for current and future support, and must determine the extent of liability for past support. RCW 26.26.130(3). The court's order is enforceable to the same extent as any other judgment. RCW 26.26.150(3). In addition, the father's estate is subject to the child's claims to inheritance, worker's compensation benefits and insurance proceeds. *See Kennedy,* 439 N.E.2d at 1370.

The paternity defendant may have substantial liberty interests at stake as well. An adjudicated father faces the possibility of incarceration for contempt if he fails to make support payments. *See Tetro v. Tetro,* 86 Wn.2d 252, 544 P.2d 17 (1975). An adjudication of paternity may also serve as the predicate for a criminal prosecution for willful nonsupport. *See* RCW 26.20.030. Moreover, the Washington version of the Uniform Parentage Act (UPA) allows the plaintiff to petition the court for an arrest warrant for the putative father *at any stage of the proceeding. See* RCW 26.26.070. Although the alleged father is afforded some protections in the case of prejudgment petitions, the UPA nonetheless permits incarceration in some cases even before the defendant has been adjudicated the father. *See* Note, *Washington's Parentage Act: A Step Forward for Children's Rights,* 12 Gonz. L. Rev. 455, 458–59 (1977).

Based essentially upon these considerations, the post–*Lassiter* decisions uniformly hold that the defendant's private interests in a paternity case are compelling, and weigh in favor of a right to appointed counsel. *See Nordgren,* 716 F.2d at 1337; *Kennedy,* 439 N.E.2d at 1370; *Carrington,* 293 S.E.2d at 99; *Stoutt,* 644 P.2d at 1135; *Corra,* 451 A.2d at 486.

Skipping to the third *Eldridge* factor—the government's interest in providing or withholding the particular procedural safeguard demanded—we find that it does not unambiguously support a right to appointed counsel. The State obviously shares the defendant's interest in obtaining an *accurate* determination of paternity. *See Little,* 452 U.S. at

14; *Corra,* 451 A.2d at 487. Thus, the interests of both parties are served if the defendant is represented by an attorney. However, the State also has a legitimate financial interest in conducting paternity proceedings as economically as possible. *See Carrington,* 293 S.E.2d at 100; *Stoutt,* 644 P.2d at 1135. *But see Nordgren,* 716 F.2d at 1338–39; *Kennedy,* 439 N.E.2d at 1371; *Corra,* 451 A.2d at 487–88.

The second *Eldridge* factor—the risk of an erroneous adjudication absent the proposed procedural safeguard—is more problematic. Several courts have emphasized that paternity adjudications are highly susceptible to error because of the absence of eyewitness testimony and the likelihood of self–serving testimony. *See, e.g., Salas,* 593 P.2d at 232 n.7; *Kennedy,* 439 N.E.2d at 1371 n.13. However, recent developments in blood testing methods, especially the Human Leukocyte Antigen (HLA) test, have greatly enhanced the ability to determine the probability of paternity. *See* Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J. Fam. L. 543 (1977–78). While we are not prepared to say that the availability of HLA tests has itself completely eliminated the risk of error, neither can we ignore the fact that the risk of error has been greatly reduced.[3] The most that can be said is that the risk of error in paternity proceedings will vary from case to case, depending upon a variety of circumstances.

The question remains whether the *Eldridge* factors overcome the *Lassiter* presumption against appointed counsel

---

[3]In considering blood test evidence, trial courts should be aware of its possible flaws. HLA tests cannot affirmatively prove paternity; they can only establish a statistical probability that the defendant is the father. *See* Jaffe, *Comment on the Judicial Use of HLA Paternity Test Results and Other Statistical Evidence: A Response to Terasaki,* 17 J. Fam. L. 457, 458 (1978–79). Indeed, the accuracy of the probabilities obtained by HLA testing depends upon the application of statistical methods, the accuracy of which has been disputed. *See* Ellman & Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?,* 54 N.Y.U. L. Rev. 1131 (1979). Accordingly, the use of HLA test results itself may, in some circumstances, give rise to complex legal, medical and scientific issues. *See Nordgren v. Mitchell,* 716 F.2d 1335, 1337 (10th Cir. 1983).

which applies when no deprivation of physical liberty is involved. *See Lassiter,* 452 U.S. at 26–27. It is certainly the case that State–initiated paternity suits "have 'quasi-criminal' overtones." *Little,* 452 U.S. at 10. In addition to the possibility of future contempt sanctions and prosecution for criminal nonsupport, there is also the possibility that the putative father will be incarcerated before judgment, if the petitioner obtains a warrant. *See* RCW 26.26-.070. However, the adjudication of paternity itself does not entail the possibility of incarceration. *See State v. Walker,* 87 Wn.2d 443, 445, 553 P.2d 1093 (1976). Although the adjudication of paternity makes possible a later contempt sanction or action for willful nonsupport, those subsequent actions would have to be based upon an intervening volitional act; *e.g.,* the decision to withhold support. The putative father, if indigent, would obviously be entitled to appointed counsel at such proceedings.

We are persuaded, therefore, that the presumption against a right to appointed counsel applies in the paternity context, *see Nordgren,* 716 F.2d at 1339; *Stoutt,* 644 P.2d at 1137; *State ex rel. Hamilton v. Snodgrass,* 325 N.W.2d 740, 742 (Iowa 1982), and we conclude that the due process clause does not require appointed counsel in all State–initiated paternity proceedings. That decision is best left to the trial court, subject to appellate review.[4]

---

[4]We recognize that the Washington Supreme Court has held that indigent defendants in paternity cases are *not* entitled to appointed counsel under the due process clause. *State v. Walker,* 87 Wn.2d 443, 553 P.2d 1093 (1976). The *Walker* court reasoned that the threat of imprisonment upon which the right to counsel depends must be immediate, and therefore held that the possibility of future contempt sanctions could not support such a right. *Walker,* however, is no longer persuasive authority for several reasons. First, *Walker* was decided shortly after *Eldridge,* and did not analyze the right to counsel issue pursuant to the three *Eldridge* factors. Obviously, *Eldridge* is controlling with respect to federal due process requirements. Second, the *Walker* court assumed that the right to counsel *requires* that the potential incarceration be the direct result of the paternity proceeding itself. But under the *Eldridge/Lassiter* approach, the complete absence of a possibility of incarceration merely gives rise to a *rebuttable presumption* against the right to counsel. Finally, in reaching its decision, the *Walker* court relied on the Michigan Court of Appeals decision in *Artibee v. Cheboygan Circuit*

We are reluctant to determine from the record before us if appointed counsel could have made a determinative difference. Accordingly, the case is remanded to the trial court to determine if Estep is entitled to appointed counsel. In making this determination,

> the trial court should proceed with an evaluation of the vital interests at stake on both sides and a determination of the degree of actual complexity involved in the given case and the corresponding nature of defendant's peculiar problems, if any, in presenting his own defense without appointed legal assistance. The judge must then weigh the foregoing factors against the overall and strong presumption that the defendant is not entitled to the appointment of counsel in a proceeding which does not present an immediate threat to personal liberty.

(Citations omitted.) *Wake Cy. ex rel. Carrington v. Townes,* 306 N.C. 333, 340–41, 293 S.E.2d 95, 100 (1982), *cert. denied,* 459 U.S. 1113 (1983).

The judgment is reversed and the case remanded for trial on the issue of paternity and for determination of Estep's right to appointed counsel.

CALLOW and ANDERSEN, JJ., concur.

Reconsideration denied September 10, 1984.

Review denied by Supreme Court December 7, 1984.

---

*Judge,* 54 Mich. App. 433, 221 N.W.2d 225 (1973). However, *Artibee* was reversed by the Michigan Supreme Court. *Artibee v. Cheboygan Circuit Judge,* 397 Mich. 54, 243 N.W.2d 248 (1976).