STATE of Iowa ex rel. Terry Ann
HAMILTON, Appellee,

v.

Michael Eugene SNODGRASS, Appellant.

No. 66493.

Supreme Court of Iowa.

Oct. 27, 1982.

Rehearing Denied Nov. 17, 1982.

Robert F. Heimer, Davenport, for appellant.

Thomas J. Miller, Atty. Gen., John R. Martin, Asst. Atty. Gen., and G. Wylie Pillers, III, Clinton County Atty., for appellee.

HARRIS, Justice.

Does an indigent paternity defendant have a constitutional right to counsel at public expense? The trial court held he does not and we agree.

These proceedings were initiated by the State under the uniform support of dependents law. Iowa Code ch. 262A (1979). The relator alleged defendant was the father of her daughter and should be required to support the child during minority and to reimburse the state for support received under the aid to dependent children pro-

gram (ADC). By mandate of a federal statute the state must commence paternity proceedings against a putative father whenever a mother applies for ADC and it is determined the father has abandoned the mother and child. 42 U.S.C. § 654(4) (1976 & Supp. III). Any support payments imposed in the proceeding are assigned by the mother to the state so long as she receives ADC support. § 252A.13. Thus the state would at present receive any support payments required of the defendant and can be said to have initiated these proceedings.

Defendant appeared *pro se* and filed an answer denying the allegations in the petition. He obtained the assistance of Attorney Robert F. Heimer for the limited purpose of obtaining counsel at public expense to represent him further. He asserted the right to counsel arises under the federal and state constitutions. The request for appointment of counsel alleged defendant was indigent within the meaning of Iowa Code section 336A.4 and was unable to retain counsel without threatening his ability to provide economic necessities for his family.

In denying the defendant's motion for appointment of counsel the trial court made no finding regarding defendant's indigency. It simply found this is a civil proceeding and that section 336A.4, defining indigency, "applies to criminal actions only." For purposes of reviewing the trial court holding we assume, without deciding, that defendant is indigent.

I. Because the proceeding is and must be brought to recoup funds for the State it is a "state action" for purposes of the due process clause. U.S. Const.amend. V; Iowa Const. art. I, § 9. Snodgrass must be afforded due process.

Defendant's due process contention arises from principles enunciated in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). If an individual is threatened with State action which will deprive him of life, liberty or property, he is entitled to due process. What process is due depends upon the nature of the government function and individual interest involved.

*State v. Grimme,* 274 N.W.2d 331, 336 (Iowa 1979).

Due process calls for "a meaningful opportunity to be heard." *Boddie v. Connecticut,* 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113, 118 (1971); *Auxier v. Woodward State Hosp.—Sch.,* 266 N.W.2d 139, 142–43 (Iowa 1978).

■■ The trial court was wrong in rejecting Snodgrass's application on the basis of a distinction between civil and criminal proceedings. Some proceedings which are called civil require appointment of counsel so it is not a question of labeling the action criminal or civil. The right to counsel has more to do with a person's stake in the proceeding and the practical effect of the outcome. *Lassiter v. Dept. of Social Services,* 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640, 648–49 (1981).

*Lassiter* is helpful here for what it explains and is controlling for what it rejects. Due process, it points out, "has never been, and perhaps can never be, precisely defined." 452 U.S. at 24, 101 S.Ct. at 2158, 68 L.Ed.2d at 648. Fundamental fairness is a part of the requirement and the requirement varies according to the interests at stake. *Id.* The court stated: "The preeminent generalization that emerges from this court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist *only where the litigant may lose his physical liberty if he loses the litigation." Id.* (Emphasis added.) Fundamental fairness presumes that an indigent's right to appointed counsel arises "only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured." *Id.* at 27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649.

■ In considering an indigent's claim of the right to appointed counsel, the court balances the *Eldridge* factors, three elements originally defined in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). It then "set[s] their net weight in the scales against the presumption that there is a right to ap-

pointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." *Id.* at 27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649. The three *Eldridge* factors are: (1) the private interests at stake, (2) the governmental interest, and (3) the risk that the procedures used will lead to an erroneous decision and the probable value, if any, of additional safeguards.

*Lassiter* was a proceeding to terminate a parental relationship. The court determined that the net weight of the *Eldridge* factors would not in every termination proceeding overcome the presumption that no right to counsel exists unless one's physical liberty is threatened. Due process determinations were left to a case by case approach. *Id.* at 32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652.

■ II. Snodgrass's interest in the proceedings are substantial but, we think, less than those of a parent in a termination proceeding. Although he claims otherwise his liberty is not immediately involved. He argues that one ramification of a finding of paternity would be possible incarceration in a later contempt proceeding for failure to make support payments. Iowa Code § 252A.3(1) (1981). It is true that the finding of paternity in these proceedings would be binding in any subsequent contempt proceeding involving the question. If Snodgrass willfully fails to make ordered support payments he is subject to civil contempt and incarceration may result. § 252A.6(13). In such a contempt hearing, of course, Snodgrass is entitled to counsel. We have recognized a right to counsel in a hearing that might directly result in incarceration. *McNabb v. Osmundson,* 315 N.W.2d 9, 14 (Iowa 1982).

Nevertheless it is only when Snodgrass would willfully ignore a court order that he would become threatened with a finding of contempt and a potential loss of liberty. Snodgrass's interest here does not differ significantly from that of an indigent defendant in a myriad of other civil proceedings. For example, the willful failure or refusal to make child support or alimony

payments could lead to a contempt proceeding. The violation of an injunction often results in a finding of contempt. A requirement of appointed counsel in paternity proceedings would inevitably lead to a requirement of appointed counsel for indigent defendants in other actions which might one day form the basis of a contempt proceeding. A paternity finding seems constitutionally indistinguishable from a vast array of court orders the violation of which might subject one to contempt.

■ III. The interests of the State are roughly the same in paternity actions and termination proceedings. The cost to the State would be vast. *McNabb,* 315 N.W.2d at 17. The imposition of such a financial burden is best left for legislative determination. *See McNabb,* separate opinion at 17–18.

The legislature might or might not wish to provide the services. Several states have adopted the uniform parentage act and provided counsel for indigent paternity defendants. Section 19(a) of that act provides that "the court shall appoint counsel for a party who is financially unable to obtain counsel." *See* Hawaii Rev.Stat. § 584–19 (1976); Minn.Stat.Annot. § 257–69(1) (West Supp.1982); Mont.Code Ann. § 40–6–119 (1981); N.D.Cent.Code § 14–17–18 (1981); Wyo.Stat. § 14–2–116 (1977). While these states have adopted section 19(a) of the uniform parentage act it is significant that three other states in adopting the act have excluded section 19(a) as a part of their state law. *See* Cal.Civ.Code §§ 7000–7018 (West 1981); Colo.Rev.Stat. §§ 19–6–101 to 19–6–129 (1981); Wash.Rev.Code Ann. §§ 26–26.010 to 26.26.905; 74.20.350 (1981). In light of this divergent legislative opinion appointed counsel should not be judicially required.

■ IV. We next weigh whether the absence of counsel in a paternity action might result in erroneous determinations. In other words, would the presence of counsel make paternity proceeding determinations more reliable? The question in a paternity suit is really one of biology. In former times disputed claims of paternity were necessarily determined mainly from the examination and cross-examination of witnesses. Thanks to scientific developments the accuracy of blood tests has dramatically improved. We have noted that the accuracy of the tests is thought to approach mathematical certainty. *See State ex rel. Buechler v. Vinsand,* 318 N.W.2d 208, 210–11 (Iowa 1982). Indeed the accuracy of the tests is such that an indigent defendant has a due process right to blood tests at public expense. *Little v. Streater,* 452 U.S. 1, 14, 101 S.Ct. 2202, 2209, 68 L.Ed.2d 627, 637 (1981).

To accord a putative father a lawyer at public expense may be of some advantage in attempting to escape the test but it has less to do than it did in times past with improving the reliability of a paternity determination. The risk of error in a paternity action is not affected in an unusual degree by the presence or absence of counsel.

■ In any event the opportunity for an erroneous result in the absence of counsel is not categorically greater in paternity cases than in cases involving the termination of parental rights. Snodgrass's federal due process claim for appointed counsel fails under the holding in *Lassiter.*

It is pointed out that a number of states have found a due process right to counsel in paternity action. *See Reynolds v. Kimmons,* 569 P.2d 799, 803 (Alaska 1977) (under state constitution); *Artibee v. Cheboygan Circuit Judge,* 397 Mich. 54, 59, 243 N.W.2d 248, 250 (1976) (under state constitution); *Salas v. Cortez,* 24 Cal.3d 22, 34, 154 Cal.Rptr. 529, 537, 593 P.2d 226, 234, *cert. denied,* 444 U.S. 900, 100 S.Ct. 209, 62 L.Ed.2d 136 (1979) (under both federal and state constitutions); *Hepfel v. Bashaw,* 279 N.W.2d 342, 348 (Minn.1979) (under supervisory power of court to ensure fairness); *Wake Cty. ex rel. Carrington v. Townes,* 53 N.C.App. 649, 654, 281 S.E.2d 765, 769 (1981), *modified and remanded,* 306 N.C. 333, ——, 293 S.E.2d 95, 100–01 (1982) (under both federal and state constitutions); *M. v. S.,* 169 N.J.Super. 209, 216, 404 A.2d 653, 656 (1979) (unspecified basis); *Madeline G. v. David R.,* 95 Misc.2d 273, 276, 407

N.Y.S.2d 414, 416 (1978) (under both federal and state constitutions); *State ex rel. Graves v. Daugherty,* 266 S.E.2d 142, 145–46 (W.Va.1980) (under state constitution). However, there are two reasons why this authority is less than compelling. First, most of these decisions are founded on interpretation of the local state constitution. Second, the decisions that found a federal due process right to counsel predate the *Lassiter* decision of the U.S. Supreme Court, and are seriously undermined by it.

There is contrary state authority. *See Wake Cty. ex rel. Carrington v. Townes,* 306 N.C. 333, ——, 293 S.E.2d 95, 100 [slip opinion (N.C. July 13, 1982)] (no absolute due process right to appointed counsel in paternity cases; decision is vested in state trial court, subject to appeal); *Sheppard v. Mack,* 68 Ohio App.2d 95, 103, 427 N.E.2d 522, 528 (1980) (no due process or equal protection right to appointed counsel); *State ex rel. Adult and Family Serv. Div. v. Stoutt,* 57 Or.App. 303, 313, 644 P.2d 1132, 1137–38 (1982) (no due process right to appointed counsel under federal or state constitutions); *State v. Walker,* 87 Wash.2d 443, 445, 553 P.2d 1093, 1095 (1976) (no due process or equal protection right to appointed counsel).

No different result is mandated by our state constitution. In *State v. Davis,* 304 N.W.2d 432, 434 (Iowa 1981), we said:

> The Supreme Court of Iowa is the final arbiter of the meaning of the Iowa Constitution, but when the federal and state constitutions contain similar provisions, they are usually deemed to be identical in scope, import, and purpose. [Authorities.] Special respect and deference is accorded United States Supreme Court interpretations of similar language in the federal constitution. [Authority.]

We reject Snodgrass's due process challenge to the trial court's refusal to appoint him counsel.

■ V. Snodgrass presents an alternative claim under the equal protection clause of both the federal and state constitutions. Our own equal protection clause (art. I § 6) places substantially the same limitations on state legislation as is placed by the equal protection clause of the Fourteenth Amendment to the federal constitution. *City of Waterloo v. Selden,* 251 N.W.2d 506, 509 (Iowa 1977).

The interests of the State are closely aligned with the relators who commence chapter 252A proceedings. But the interests of the State and the putative fathers are dissimilar. It is axiomatic that "[a]ll persons need not be treated alike to meet constitutional standards of equal protection. It is enough if all members of the same *class* are treated equally." *Hack v. Auger,* 228 N.W.2d 42, 43 (Iowa 1975) (emphasis in original). "Equal protection assurances do not require dissimilar situations to be treated similarly." *Selden,* 251 N.W.2d at 509. In providing counsel to the relators the State is aiding a class of plaintiffs whose interests closely resemble its own. Such exercise of a State's right to promote its own interests through litigation does not carry with it an obligation to support the litigation efforts of those opposing the State's interests. The equal protection challenge is not well taken.

AFFIRMED.

All Justices concur except UHLENHOPP, J., REYNOLDSON, C.J., and McCORMICK and LARSON, JJ., who dissent.

UHLENHOPP, Justice (dissenting).

In this appeal Snodgrass contends that the due process and the equal protection clauses of the United States and Iowa Constitutions guarantee an indigent defendant a right to appointed counsel in state-initiated paternity proceedings under chapter 252A of the Iowa Code. I do not reach the equal protection issue although I think it presents a serious problem in view of the provision of an attorney at public expense on the other side of the case.

I am not concerned about the defendant who is in fact the father of the child but rather with the defendant who did not father the child. The courts have no magic way of ascertaining the actual fatherhood

of the child. They must depend on the evidence and the presentation of the case in court, and therein lies the necessity for assistance on both sides by attorneys versed in law and legal procedure. The state has stationed prosecutors throughout Iowa for these cases, but the defendant may be unrepresented. Obviously we cannot *assume* that every defendant charged with paternity is guilty.

I. *Indigency.* Snodgrass's claim of right to appointed counsel is predicated upon his indigency. The record establishes that he is in fact indigent. Since the court majority assumes arguendo that he is indigent, I will not dwell on that point.

II. *Due process—right to counsel.* Coming to the merits, the due process clause of the fourteenth amendment to the United States Constitution states, "... nor shall any State deprive any person of life, liberty, or property, without due process of law...." The corresponding clause in the Iowa Constitution contains similar language and is basically the same in scope, import, and purpose. Iowa Const. Art. I, § 9. *See In re Johnson,* 257 N.W.2d 47, 49 (Iowa 1977); *Chicago Title Insurance Co. v. Huff,* 256 N.W.2d 17, 23 (Iowa 1977); *Davenport Water Co. v. Iowa State Commerce Comm'n,* 190 N.W.2d 583, 593 (Iowa 1971). I therefore find no necessity to consider the two constitutional clauses separately. *See Moorman Manufacturing Co. v. Bair,* 254 N.W.2d 737, 745 (Iowa 1977), *aff'd,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) ("[A] separate discussion of the [due process clauses in the federal and state constitutions] is not necessary under the general principle that similar constitutional guarantees are usually deemed to be identical in scope, import and purpose.").

The majority also agrees that the state's involvement in proceedings under chapter 252A is sufficient to satisfy the "state action" requirement of the due process clause. Due process must be afforded when an individual is threatened by state action which will deprive him of a protected liberty or property interest. *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d

711, 730–31 (1977); *State v. Grimme,* 274 N.W.2d 331, 336 (Iowa 1979).

As the United States Supreme Court recently noted, due process "has never been, and perhaps can never be, precisely defined." *Lassiter v. Department of Social Services of Durham County,* 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640, 648 (1981). Rather, it embodies the requirement of "fundamental fairness," a flexible concept which "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). Applying the due process guarantee is thus an exercise in ascertaining the procedures which are necessary under the particular circumstances to satisfy the requirement of fundamental fairness.

The Court has also stated, "[D]ue process requires, *at a minimum,* that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a *meaningful opportunity to be heard." Boddie v. Connecticut,* 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113, 118 (1971) (emphasis added). *See also Little v. Streater,* 452 U.S. 1, 5–6, 101 S.Ct. 2202, 2205, 68 L.Ed.2d 627, 632 (1981); *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656; 94 L.Ed. 865, 872 (1950). The question in the present case is whether counsel is required for an indigent defendant in a state-initiated paternity action to ensure that the defendant has a meaningful opportunity to be heard.

The trial court relied on the distinction between civil and criminal proceedings and on the general rule that counsel in a civil proceeding is not constitutionally mandated. That distinction, as the majority recognizes here, is no longer tenable as to all civil proceedings, in light of decisions which have found a right to counsel despite the civil nature of the particular action. *See Lassiter,* 452 U.S. at 31–32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652 (due process right to counsel

under some circumstances in civil proceedings to terminate parental rights); *In re Gault,* 387 U.S. 1, 41, 87 S.Ct. 1428, 1451, 18 L.Ed.2d 527, 554 (1976) (due process right to counsel in civil proceedings for adjudication of juvenile delinquency); *Cleavor v. Wilcox,* 499 F.2d 940, 945 (9th Cir.1974) (case-by-case determination of due process right to counsel in child dependency and neglect proceedings); *McNabb v. Osmundson,* 315 N.W.2d 9, 14 (Iowa 1982) (due process right to counsel in civil contempt proceedings); *Chambers v. District Court of Dubuque County,* 261 Iowa 31, 35, 152 N.W.2d 818, 821 (1967) (right to counsel in appeals from proceedings terminating parental relationship); *Salas v. Cortez,* 24 Cal.3d 22, 34, 154 Cal.Rptr. 529, 537, 593 P.2d 226, 234, *cert. denied,* 444 U.S. 900, 100 S.Ct. 209, 62 L.Ed.2d 136 (1979) (due process right to counsel in civil proceedings to establish paternity). The emerging rule appears to be that the right to counsel issue is not to be determined by labeling the action as criminal or civil, but rather by inquiring into the nature and magnitude of the interests involved, the ramifications of an adjudication, and the features which distinguish the action from ordinary civil proceedings. *Salas,* 24 Cal.3d at 27, 154 Cal.Rptr. at 533, 593 P.2d at 230.

The United States Supreme Court recently developed a balancing test for analyzing due process right-to-counsel claims. The test takes into account the underlying interests in the particular proceeding. *Lassiter,* 452 U.S. 18, 101 S.Ct. 2154, 68 L.Ed.2d 640. In *Lassiter* the Court dealt with a proceeding to terminate the parent-child relationship. The Court's analysis began with a review of its past right-to-counsel cases and with the extraction from those cases of the presumption "that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty." The Court continued, "It is against this presumption that all the other elements in the due process decision must be measured." 452 U.S. at 26–27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649. The Court next set forth a balancing test employing the three factors first identified in *Matthews v.*

*Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). Those factors are determinative of the specific dictates of due process for a given proceeding: (1) the private interests at stake, (2) the governmental interests, and (3) the risk that the procedures used will lead to an erroneous decision and the probable value, if any, of additional procedural safeguards. The Court then stated: "We must balance [the three] elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." 452 U.S. at 27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649. Application of that test in *Lassiter* resulted in the conclusion that the net weight of the *Eldridge* factors could not be found in every proceeding to terminate the parent-child relationship, to overcome the presumption of no right to counsel when deprivation of civil liberty was not involved. The Court therefore held that the determination of whether due process required counsel in such proceedings should be left to the courts on a case-by-case basis. 452 U.S. at 31–32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652.

Applying the *Lassiter* analysis to the facts here, I note first that an action to establish paternity under chapter 252A is civil proceeding, Iowa Code § 252A.1 (1981); *State ex rel. Bishop v. Travis,* 306 N.W.2d 733, 734 (Iowa 1981), and incarceration is not imposed on a paternity finding alone. If the defendant in the action is unsuccessful on the merits, the trial court enters an order establishing paternity and setting a proper amount of support. Iowa Code § 252A.3(1). Thus the adjudication itself does not confront a defendant with a threat that he will be deprived of his physical liberty if he loses the case. Under the *Lassiter* test the analysis must therefore start with the presumption that due process does not require counsel in these proceedings. But against that presumption the three *Eldridge* factors must be placed in the balance.

A. The first factor to consider is the private interest of a defendant that is implicated in an action to establish paternity. That interest can be divided into three parts: the defendant's interest in his personal liberty, in his property, and in his familial relationships.

Snodgrass contends that although he faces no immediate risk of incarceration if he is unsuccessful in this litigation—he is not imprisoned merely on a finding he fathered the child—he nevertheless has a significant liberty interest at stake. He argues that one ramification of a finding of paternity in the present suit would be the possibility of incarceration in later contempt proceedings for failure to make support payments for which he would be obligated. *See* Iowa Code § 252A.3(1). He also argues that a paternity finding would be res judicata in subsequent contempt proceedings. He therefore reasons that issues determined in the present proceeding may directly control subsequent proceedings in which his personal freedom is in fact endangered.

Snodgrass is right that a defendant who wilfully fails to make court-ordered support payments exposes himself to civil contempt proceedings in which incarceration may result. Iowa Code § 252A.6(13). Although an indigent defendant has a right to counsel in a contempt proceeding if incarceration is to be imposed, *McNabb,* 315 N.W.2d at 14, the presence of an attorney at that stage may be too late to interpose what may often be the defendant's only defense—that he is not the father. An adjudication of paternity in a proceeding under chapter 252A is res judicata in subsequent civil contempt proceedings. *See Reynolds v. Kimmons,* 569 P.2d 799, 802 (Alaska 1977); *Artibee v. Cheboygan Circuit Judge,* 397 Mich. 54, 58–59, 243 N.W.2d 248, 250 (1976). A finding of paternity in the present proceeding may thus have a direct bearing on the outcome of a subsequent enforcement proceeding in which the physical liberty of Snodgrass is at stake; it places the State on "third base" in that proceeding. While the indigent defendant has counsel in the subsequent proceeding to contest the *wilfullness*

issue, he did not have counsel in the prior proceeding on the *paternity* issue on which the subsequent proceeding is founded.

The argument is unpersuasive that a defendant need have no concern about contempt because he can only be found in contempt if he wilfully fails to pay support. In the first place, whether the defendant wilfully failed to pay or could not pay is frequently a judgment call in itself. Second, the wilfullness requirement for contempt cannot be much consolation to the defendant who knows he is not the father but could not adequately defend the paternity suit for want of counsel; he still has a contest on his hands in the contempt proceeding.

Failure to provide support also exposes a defendant to criminal prosecution for nonsupport, a class D felony. Iowa Code § 726.5. Although a defendant would unquestionably be entitled to counsel in that prosecution, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), once again the assistance of counsel at that stage might be of questionable value in view of the previous adjudication of paternity. *See Wake County ex rel. Carrington v. Townes,* 53 N.C.App. 649, 654, 281 S.E.2d 765, 769 (1981), *modified and remanded,* 306 N.C. 333, 293 S.E.2d 95 (1982) (adjudication of paternity in state-initiated civil proceeding res judicata of issue in subsequent criminal action for nonpayment of support). *See also* Iowa Code § 726.5 ("Support, for purposes of this section, means any support which has been fixed by court order ...."). Thus a finding of paternity in a civil action may have significant impact in a subsequent criminal proceeding in which the defendant's physical liberty is threatened. *See Salas,* 24 Cal.3d at 28–29, 154 Cal.Rptr. at 534, 593 P.2d at 231 ("While an indigent is entitled to counsel if prosecuted criminally for nonsupport, the most significant element of the offense—paternity—may have already been determined in a civil proceeding in which the defendant was unrepresented by counsel.").

I recognize that many civil proceedings result in judgments which could bring about incarceration in future contempt proceedings, such as injunctions, specific performance suits, and child support in dissolution cases. The majority seemingly fears that requiring counsel in paternity proceedings "would inevitably lead to a requirement of appointed counsel for indigent defendants in other actions which might one day form the basis of a contempt proceeding." A paternity action, however, is not an ordinary civil action. In paternity proceedings the full power of the state is pitted against an indigent person concerning the existence of a fundamental biological relationship which entails serious financial, legal, and moral obligations. *See Salas,* 24 Cal.3d at 32, 154 Cal.Rptr. at 536, 593 P.2d at 233.

The potential for incarceration in future contempt proceedings would not alone entitle Snodgrass to counsel in this paternity proceeding. But that potential and the res judicata effect of the paternity adjudication are important factors *to consider* under the *Eldridge* tests.

Snodgrass also argues that property interests are involved in the present action. An adjudication of paternity renders a defendant liable for "a fair and reasonable" amount of support during the child's minority. Iowa Code § 252A.3(1). Child support payments extended over the period of the child's minority can, without question, place a sizable financial burden on a defendant. The obligation is enforceable through garnishment proceedings, and the defendant's wages are not protected by the maximum yearly garnishment limitation applicable to ordinary civil judgments. Iowa Code §§ 642.21(1), 627.12. Unlike most civil judgments, the support obligation is not dischargeable in bankruptcy. 11 U.S.C. § 523(a)(5) (1979).

Important familial interests are inextricably involved in a paternity action, as the purpose of the proceeding is to impose a parent-child relationship on the defendant and the child. To me, this is the most vital aspect of paternity litigation, and demands that the decision in such proceedings be as true as is possible in human affairs. The United States Supreme Court recently emphasized the fundamental nature of the relationship when it noted, "This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. Just as the termination of such bonds demands procedural fairness, so too does their imposition." *Little v. Streater,* 452 U.S. 1, 13, 101 S.Ct. 2202, 2209, 68 L.Ed.2d 627, 637 (1981) (citations omitted). The California Supreme Court is in accord:

> The [paternity] cases before this court involve more than monetary judgments. They were bought under statutory authority to declare the existence of the most basic biological relationship, that of parent and child. A determination of paternity has grave implications for all concerned—the alleged father, the child, the mother and the state. This court has termed the interest in maintaining a parent-child relationship "a compelling one, ranked among the most basic of civil rights...." Freedom from an incorrect imposition of that relationship on either a parent or a child is an equally compelling interest.

*Salas,* 24 Cal.3d at 27–28, 154 Cal.Rptr. at 533, 593 P.2d at 230 (citations omitted). In addition to the creation of a fundamental relationship, a finding of paternity has the potential of disrupting established family relationships of the defendant and, because of the social stigma associated with the finding, of damaging his reputation. *See Hepfel v. Bashaw,* 279 N.W.2d 342, 345 (Minn.1979); *Wake County,* 53 N.C.App. at 657, 281 S.E.2d at 770.

I conclude that significant liberty, property, and familial interests are involved in paternity proceedings.

B. The second *Eldridge* factor requires inquiry into the risk that a paternity action involving an unrepresented defendant may result in an erroneous determination and into the extent to which the involvement of counsel may improve the reliability of the determination. Courts which have under-

taken this inquiry have found that paternity actions are quite complex in nature and that the risk of erroneous results are substantial where the defendants are without counsel. *Reynolds,* 569 P.2d at 802–03; *Salas,* 24 Cal.3d at 30–31, 154 Cal.Rptr. at 535, 593 P.2d at 232; *Artibee,* 397 Mich. at 57, 243 N.W.2d at 249; *Hepfel,* 279 N.W.2d at 345; *Wake County,* 53 N.C.App. at 659, 281 S.E.2d at 771–72. Many such indigents are uneducated and, more significantly, do not comprehend judicial procedure. On one side of counsel table sits the state's attorney, skilled in law, experienced in the procedures of paternity actions, and in command of the resources and facilities of the state. Obviously, the unrepresented indigent defendant on the other side of the table is no match. While this alone would not require counsel for the defendant—we have numerous civil proceedings by governmental units involving unrepresented defendants—this again is a factor to be *considered* under *Eldridge.*

An important aspect of the paternity proceeding is the blood-group test. Results of those tests are admissible as evidence that a defendant is biologically incapable of being the parent of the child. The importance of such tests in paternity actions was recently emphasized in *Little v. Streater,* where the United States Supreme Court held that under the circumstances of the case an indigent defendant had a due process right to a blood test at state expense. With regard to those tests the Court stated:

> Given the usual absence of witnesses, the self-interest coloring the testimony of the litigants, and the State's onerous evidentiary rule [a mother who continues constant in her accusation of paternity establishes a prima facie case which the defendant cannot overcome solely by his own testimony] and refusal to pay for blood grouping tests, the risk is not inconsiderable that an indigent defendant in a Connecticut paternity proceeding will be erroneously adjudged the father of the child in question. Further, because of its recognized capacity to definitively exclude a high percentage of falsely accused putative fathers, the availability of scientific blood test evidence clearly would be a valuable procedural safeguard in such cases. Connecticut has acknowledged as much in § 46–b–168 of its statutes by providing for the ordering of blood tests and the admissibility of negative findings. Unlike other evidence that may be susceptible to varying interpretation or disparagement, blood test results, if obtained under proper conditions by qualified experts, are difficult to refute. Thus, access to blood grouping tests for indigent defendants such as appellant would help to insure the correctness of paternity decisions in Connecticut.

452 U.S. at 14, 101 S.Ct. at 2209, 68 L.Ed.2d at 637 (citations omitted). Recently blood testing has been further refined to show the plausibility or implausibility of paternity. *State ex rel. Buechler v. Vinsand,* 318 N.W.2d 208, 211–12 (Iowa 1982).

The use of the blood test, however, is largely dependent on the assistance of counsel. As noted by the North Carolina Court of Appeals, "[A]n indigent defendant's right to a free blood grouping test may be rendered meaningless without counsel to advise him of his right to demand such a test, to explain the test's significance, to ensure that the test is properly administered, and to ensure that the results are properly admitted into evidence." *Wake County,* 53 N.C.App. at 658, 281 S.E.2d at 771. *See also Salas,* 24 Cal.3d at 30–31, 154 Cal.Rptr. at 535, 593 P.2d at 232; *Hepfel,* 279 N.W.2d at 345.

I disagree with two aspects of the majority's statement, "To accord a putative father a lawyer at public expense may be of some advantage in attempting to escape the test but it has less to do than it did in times past with improving the reliability of a paternity determination." First, I do not visualize defense counsel as aiding the defendant in attempting to escape a test. If a contemplated test is a recognized one and is to be properly administered, reported, and introduced, I see defense counsel as not only cooperating but actually initiating the test. *See In re the Marriage of Schneckloth,* 320 N.W.2d 535 (Iowa 1982) (blood grouping

showed defendant could not be father, mother attempted unsuccessfully to keep test out of evidence). Second, with the advent of blood-group tests, attorneys in paternity proceedings have a greater rather than lesser role than in former times. *Id.* at 537–38 (problems of foundation evidence in the introduction of these tests). Initially, someone must inform the defendant about blood tests, then that someone must arrange for them and have them administered, then he must obtain the results, and then he must lay an evidentiary foundation and introduce them in evidence. In real life that someone is defense counsel. Without help the indigent defendant cannot possibly succeed, and he cannot rely for help on benign concern by the state's attorney. The defendant and the state's attorney are not confederates; they are combatants.

Defense counsel may also help overcome the potential for erroneous paternity adjudications which arises from the nature of the action. Since sexual activities usually take place in private, outside witnesses are ordinarily unavailable. Frequently the only testimony is by the parties themselves, and that evidence naturally tends to be self-serving. *See* H. Krause *Illegitimacy: Law and Social Policy* 106–07 (1971).

The risk of error in a paternity proceeding is not insubstantial when the parties have representation. If one of the parties is compelled to participate in the complexities of such a proceeding without counsel, the risk of error increases.

C. The final *Eldridge* factor necessitates a review of the state's interest in actions to establish paternity. An argument can be made that the presence of counsel on both sides of the controversy may stimulate litigation. I put aside the proposition that the stimulation of litigation may not always be bad. Increased litigation is not, however, a necessary result of providing a defendant with counsel in paternity suits. " 'Faced with strong scientific evidence of paternity, many defendants [after being represented by counsel and engaging in discovery] arrive at a settlement with the district attorney without the expense of a trial.' " *Wake*

*County,* 53 N.C.App. at 661, 281 S.E.2d at 772, quoting from *Salas,* 24 Cal.3d at 33, 154 Cal.Rptr. at 536–37, 593 P.2d at 234.

The state itself has interests which may be advanced by the presence of counsel. It shares an interest with the mother, the child, and the putative father in obtaining an accurate determination of paternity. *Little,* 452 U.S. at 14, 101 S.Ct. at 2209, 68 L.Ed.2d at 637. One court has noted that "the state has no legitimate interest in incorrectly ascribing parentage and imposing the obligations of fatherhood on someone other than the child's actual father." *Salas,* 24 Cal.3d at 33, 593 P.2d at 233, 154 Cal. Rptr. at 536.

An accurate determination of paternity may also increase the likelihood that the named father will actually provide the court-ordered support payments. Certainly a defendant will not as enthusiastically make payments if he was not represented and was thus unable to present his defense effectively. *Wake County,* 53 N.C.App. at 661, 281 S.E.2d at 772.

Taking the factors altogether, I would hold under *Eldridge* that the usual rule in civil cases is overcome and that an indigent defendant in paternity proceedings has a constitutional right to counsel under both the United States and Iowa Constitutions. I agree with the view of the California Supreme Court:

A [paternity] judgment rendered [without the assistance of counsel] is not only unfair, it is unreliable. Recognizing the complexity of these proceedings and the importance of their outcome to the state, the mother and the child, the Legislature has afforded the mother and child the assistance of counsel in prosecuting their claim. However, by intervening heavily on behalf of one side in what has tradionally been a private dispute, the state has skewed the outcome of the case. The chances that the significant consequences of fatherhood will be imposed on an innocent man obviously increase dramatically if, because he is unable to afford counsel, the defendant offers no defense. They increase still further if counsel for the

plaintiff is a specialist in prosecuting such claims. Unless the rights of indigent paternity defendants are protected, courts risk finding not the right man, but simply the poorest man to be the father of a child. If paternity is to be determined in an adversary proceeding at the behest of the state, surely the interests of all concerned demand that the defendant be able to defend fully and fairly. He cannot do so when his indigency prevents him from obtaining counsel.

24 Cal.3d at 31, 154 Cal.Rptr. at 535, 593 P.2d at 232 (citations and footnote omitted).

Other jurisdictions confronting the issue have reached similar results. *Reynolds,* 569 P.2d at 803 (due process clause of Alaska Constitution requires counsel); *Kennedy v. Wood,* Ind.App., 439 N.E.2d 1367, 1374 (1982); *Artibee,* 397 Mich. at 59, 243 N.W.2d at 250 (due process clause of Michigan Constitution gives right to counsel); *Hepfel,* 279 N.W.2d at 348 (right to counsel established pursuant to supervisory power of court to ensure fair administration of justice); *Wake County,* 53 N.C.App. at 661, 281 S.E.2d at 773 (federal and state due process give right to counsel); *M. v. S.,* 169 N.J.Super. 209, 216, 404 A.2d 653, 656 (1979) (right to counsel on unspecified basis); *Madeline G. v. David R.,* 95 Misc.2d 273, 276, 407 N.Y.S.2d 414, 416 (1978) (federal and state due process right to counsel); *Corra v. Coll,* —— Pa.Super. ——, 451 A.2d 480 (1982); *State ex rel. Graves v. Daugherty,* 266 S.E.2d 142, 145–46 (W.Va.1980) (due process clause of state constitution gives right to counsel). *See generally* Annot., 4 A.L.R. 4th 363 (1981).

The majority indicates the results in these other jurisdictions are seriously undermined to the extent those courts rely on state rather than federal constitutional grounds. But the states relying on their own constitutions have due process clauses identical to our state due process clause. *Compare* Iowa Const. Art. I, § 9 ("[n]o person shall be deprived of life, liberty, or property, without due process of law"), *with* same language in Alaska Const., Art. I, § 7; Calif. Const., Art. I, § 13; Mich. Const.1963,

Art. I, § 17; N.Y. Const. Art. I, § 6; W.Va. Const., Art. III, § 10. The majority also cites to jurisdictions which have refused to find a due process requirement of counsel for indigent defendants in paternity proceedings. One of the cases so cited, however, did not hold that counsel is to be denied but held that while a blanket guarantee of counsel cannot be given, the *Eldridge* factors must be weighed on a case-by-case basis, and remanded for such a determination. *Wake County ex rel. Carrington v. Townes,* 306 N.C. 333, ——, 293 S.E.2d 95, 98 (1982).

In addition, section 19(a) of the Uniform Parentage Act provides that "the court shall appoint counsel for a party who is financially unable to obtain counsel." 9A U.L.A. 579, 611 (1979). That act including the right to counsel provision has been adopted by several states. Hawaii Rev. Stat. § 584–19 (1976); Minn.Stat.Annot. § 257–69(1) (West Supp. 1982); Mont.Code Ann. § 40–6–119 (1981); N.D. Cent. Code § 14–17–18 (1981); Wyo.Stat. § 14–2–116 (1977).

Finally, I disagree with the majority's distinguishing the situation of termination of the parent-child relationship. This court dealt with the right to counsel on appeal in the termination situation in the case of *In re Interest of Chambers,* 261 Iowa 31, 152 N.W.2d 818 (1967). The statute involved there gave the parent the right to an attorney at trial, and this court extended that right to appeal. While this court relied on the statute in doing so, it also based the holding on *In re Gault,* 387 U.S. 1, 58, 87 S.Ct. 1428, 1460, 18 L.Ed.2d 527, 563 (1967). *Gault* was founded on a constitutional guarantee of counsel. I do not think that creation of the parent-child relationship is any less vital for all concerned than termination of the relationship.

Snodgrass is indigent and he desires counsel. In my opinion the paternity proceedings cannot go forward under the United States Constitution or the Iowa Constitution unless he is represented. I would reverse the judgment.

REYNOLDSON, C.J., and McCORMICK and LARSON, JJ., join in this dissent.